LAW OFFICE OF SANDRA D. PARKER
477 Madison Avenue, Suite 410
New York, NY 10022
(212) 317-2883
Sandra D. Parker
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x        EFC CASE
TIFFANI JOHNSON,

                      Plaintiff,

                                                                                                        COMPLAINT AND
                -against-                                              JURY DEMAND

IAC/INTERACTIVECORP, and                        11 CIV 7909 (NRB)(MRD)
CONNECTED VENTURES LLC,

                      Defendants.
-------------------------------------------------------x

       Plaintiff, Tiffani Johnson, for her Complaint against the Defendants, respectfully alleges as follows:

       1.       This is an action for declaratory judgment, injunctive relief and damages, instituted against the defendants, for unlawful employment practices and employment discrimination, based on paintiff's race, pursuant to the Civil Rights Act of 1866 (as amended), 42 USC sec. 1981, and the New York City Human Rights Law, NYC Admin. Code sec. 8-107 et seq.

       2.       Plaintiff further alleges that defendant created and maintained a hostile environment, in which she was forced to work, and retaliated against her for complaining of their discriminatory practices, in violation of the Civil Rights Act of 1866 (as amended), 42 USC sec. 1981, and the New York City Human Rights Law, NYC Admin. Code sec. 8-

107 et seq.

3. Jurisdiction over the subject matter of this complaint is conferred on this Court, pursuant to 28 USC sec. 1331, 28 USC sec. 1343 and 42 USC sec. 1981.

4. Jurisdiction over the subject matter of this complaint also is conferred on this Court, pursuant to 28USC sec. 1332, in that plaintiff is a citizen of the State of New York, and defendants, upon information and belief are citizens of the State of Delaware, and the matter in controversy exceeds the sum of Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interests and costs.

5. The Court's pendent jurisdiction is invoked pursuant to 28 USC sec. 1367(a). Plaintiff further invokes the Court's jurisdiction, pursuant to 28 USC sec. 2201 and 2202.

6. The venue of this action is properly placed in the Southern District of New York, pursuant to 28 USC sec. 1391(b).

7. Tiffani Johnson (Johnson) is an African-American female citizen of the United States. At all times relevant herein, Johnson resided in the State of New York, and City of New York.

8. Upon information and belief, at all times relevant herein, defendant IAC/INTERACTIVECORP (IAC) was and is an internet company, organized as a corporation, pursuant to the laws of the State of Delaware. Upon information and belief, IAC was and is authorized to conduct, conducted and conducts business in the State of New York, City and County of New York, with offices located at 555 West 18th Street, New

York, New York.

9.  Upon information and belief, at all times relevant herein, defendant Connected Ventures LLC (Connected Ventures) was and is a limited liability company, organized pursuant to the laws of the State of Delaware, was and is authorized to conduct, conducted and conducts business in the State of New York, City and County of New York, with offices located at 555 West 18th Street, New York, New York.

10. Upon information and belief, in or about August 2006, IAC acquired Connected Ventures.

11. IAC and Connected Ventures operate CollegeHumor Network (CollegeHumor), an internet comedy website.

12. Newly hired employees, employed by defendants to work on CollegeHumor, including those employees hired to fill the position of video editor, are required to complete a document entitled "IAC Application for Employment."

13. On the IAC Application for Employment form, among the questions the prospective employee must answer, and information she must provide are the following: "Have you ever worked for IAC/InterActiveCorp under another name?;" "If employed by IAC/InterActiveCorp, can you submit verification of your legal right to work in the US?;" and "If employed by IAC/InterActiveCorp, do you intend also to be employed by another organization or self-employed?"

14. The IAC Application for Employment form further states that the applicant or new hire, "hereby authorize[s] any previous or current employer or educational

institution, or any other person whom IAC/InterActiveCorp may contact, to give IAC/InterActiveCorp any information concerning my previous or current employment or education."

15.     Newly hired employees, hired by defendants to work on CollegeHumor, including those employees hired to fill the position of video editor are provided with documents and information, containing the following titles: "IAC Human Resources Policy Manual;" "IAC New Hire Orientation;" "IAC Mission;" "IAC Executive Team;" "IAC Human Resources Department, Payroll, Benefits & More;" "IAC Provided Disability Insurance;" "IAC 401(k);" "IAC Employee Assistance;" and "IAC Benefits Service Center."

16.     Johnson holds a Bachelor of Arts Degree in Broadcast Journalism, and a Masters of Science Degree in Digital Imaging and Design.  Johnson also has extensive experience in creating and editing digital video projects.

17.     For example, prior to being employed by the defendants, Johnson worked as a Professor of Digital Production, at the City University of New York.  Johnson also worked as a Visual and Content Producer, and Senior Editor at Daedalus Productions, Inc.

18.     In or about June 2010, Johnson responded to an advertisement for a position of digital graphic artist with the defendants.

19.     Thereafter, she was interviewed by David Fisel (Fisel).  During the interview, she learned that the opening was for work to be done on CollegeHumor.  At the time of said interview Fishel, upon information and belief was the head of Post Production, on CollegeHumor.

20. Following said interview, Fishel called Johnson in, to perform editing work on a video project. Said editing work Fishel required Johnson to perform was part of the interview process, and her application for a position with the defendants.

21. On or about August 6, 2010, Johnson received an email from Samuel Reich (Reich), offering her the position of video editor, inquiring about her salary requirements, and stating that Fishel highly recommended her for the position. At the time, Reich upon information and belief was the head of Original Content at CollegeHumor.

22. Thereafter, Johnson received an email from Katie McGregor, Director of IAC Human Resources, confirming the offer of the position of video editor, and requesting that Johnson complete IAC's Application for Employment form.

23. Upon being hired, among the documents and information defendants provided Johnson, were the "IAC Human Resources Policy Manual;" "IAC New Hire Orientation;" "IAC Mission;" "IAC Executive Team;" "IAC Human Resources Department, Payroll, Benefits & More;" "IAC Provided Disability Insurance;" "IAC 401(k);" "IAC Employee Assistance;"and "IAC Benefits Service Center."  After completing all necessary paper work, Johnson began working for defendants as video editor, on or about August 31, 2010.

24. Some time after Johnson was hired, but before she started work for defendants, Fishel stopped working for defendants.

25. When Johnson began working for the defendants, instead of reporting to and being supervised by Fishel, she reported to and was supervised by David Schaubach

(Schaubach).

26     When Johnson began working for the defendants, she was one of approximately two (2) African-Americans working under Reich and Schaubach.

27.    Approximately two (2) months, after Johnson began working for defendants, the other African-American employee, left her position with defendants, because of the hostile environment in which she was forced to work.

28.    During Johnson's entire tenure with defendants, she performed her duties in an exemplary manner.

29.    During her employment with defendants, defendants among other things, required Johnson to perform duties and assume responsibilities not performed or assumed by other video editors, and in particular Caucasian and non-African-American video editors.

30.    During her employment with defendants, defendants required Johnson to meet certain standards, and expectations not demanded of other video editors, and in particular Caucasian and non-African-American video editors.

31.    During her employment with defendants, defendants fostered and condoned a work environment permeated with the ridicule and disparagement of African-Americans, with workers freely pointing out the alleged " problems with black people."

32.    During her employment with defendants, defendants' employees made derogatory comment regarding Johnson's hair.

33     During her employment with defendants, defendants spoke to Johnson in a demeaning manner.

6

34. During her employment with defendants, defendants assigned her the least desirable, and the most demanding and difficult project, on which to work.

35. Defendants did not subject Caucasian employees to the above described treatment.

36. During her employment with defendants, defendants failed and refused to provide Johnson with support to perform her duties, dismissed her complaints about work assignments and other disparate treatment, while providing support to Caucasian employees and readily addressing the complaints of Caucasian employees.

37. Johnson worked for defendants for approximately one (1) year. From the time Johnson began working for defendants, in or about August 2010 until June 10, 2011, Johnson was not reprimanded for poor work performance, Johnson was not informed that her work performance was deficient or below any standards set by defendants, Johnson was not informed that she faced termination unless she improved her work performance.

38. From in or about August 2010 until June 10, 2011, defendants did not inform Johnson that her performance needed improvement, or that she needed to take steps to improve her work performance.

39. During the entire tenure of Johnson's employment with defendants, defendants did not provide her with a performance review.

40. In or about May 2011, defendants assigned Johnson to work exclusively on a project that was the subject of extensive and constant complaints by Caucasian employees, as undesirable, riddled with problems and difficult to perform. Prior to that

time, defendants did not restrict this difficult and undesirable assignment to the only African-American video editor, whom they employed.

41. During the time defendants assigned Johnson to work exclusively on said project, Johnson brought to defendants' attention, the difficulties she encountered in performing the assigned tasks on said project.

42. During the time defendants assigned Johnson to work exclusively on said project, Johnson sought defendants' assistance in addressing the difficulties she encountered in performing the assigned tasks on said project.

43. Defendants ignored Johnson's complaints about the difficulties she encountered in performing the assigned tasks on said project.

44. Defendants failed and refused to provide Johnson, with assistance in performing the assigned tasks on said project.

45. On June 10, 2011, approximately one (1) month after defendants assigned Johnson to work exclusively on the undesirable, difficult and problem ridden project, Schaubach summoned Johnson to his office. He then proceeded to tell Johnson that he did not believe her work was "up to par" and placed Johnson on a two-week "probation," during which she was required to bring her work "up to par," or face termination of employment.

46. During the June 10, 2011 meeting, Schaubach told Johnson to look for work elsewhere. During the June 10, 2011 meeting with Schaubach, he indicated that irrespective of her performance during the two-week "probationary" period, she was going to be fired.

47. During the two week "probationary" period, defendants required Johnson to continue to work exclusively, on the most difficult and least desirable project, to which they had assigned her beginning in May 2011.

48. During the two week "probationary" period, defendants continued to ignore Johnson's complaints and requests for assistance to address the difficulties associated with said project.

49. During the two week "probationary" period, defendants subjected Johnson to a barrage of emails criticizing her work on said project, while failing to provide her with the requested assistance.

50. On June 24, 2011, Schaubach summoned Johnson to his office, where he terminated her employment.

51. Johnson, then attended a meeting with Katie McGregor (McGregor), IAC's Director of Human Resources, who among other things presented Johnson with a severance agreement, dated June 24, 2011 where, in return for accepting $2,500.00 from defendants, she would forever relinquish her rights to press her claims of discriminatory treatment, and wrongful termination.

52. Among other things, the severance agreement states that all notices and communications required by said agreement are deemed sufficient is they are sent to "General Counsel, Programming, IAC/InterActiveCorp., 555 West 18th Street, New York, NY 10011."

53. McGregor also provided Johnson with other documents and information

9

regarding the disposition of her benefits under various IAC benefit plans. In or about July 2011, Johnson received communication from *charles*SCWAB, regarding her account balance in the "IAC/InterActiveCorp Retirement Savings Plan."

54. Upon her termination, Johnson through her attorney sought to address her concerns regarding the discriminatory treatment to which defendants subjected her and her wrongful termination. Johnson made attempts to address those concerns with McGregor.

55. McGregor responded by letter dated July 11, 2011 on IAC letterhead, that she had referred the matter to "our legal counsel" who allegedly would investigate the matter and thereafter respond to the letter of Johnson's counsel.

56. Said legal counsel to whom McGregor allegedly referred Johnson's complaints was Joshua Sussman (Sussman), Vice President and General Counsel Programming, IAC.

57. Sussman responded by among other things, citing defendants' allegedly continued employment of an African-American male, as evidence of their non-discriminatory conduct, when said male employee was neither an African-American nor identified himself as African-American.

58. Instead of properly investigating Johnson's claim of discriminatory treatment, and addressing her complaints, defendants took steps to retaliate against her for her complaints.

59. Upon information belief, defendants have disparaged Johnson, and have made

negative comments concerning Johnson, to prospective employers.

60. Following the termination of Johnson's employment, other African-American employees severed their employment relationship with defendants.

61. Following Johnson's termination, defendants replaced her with a Caucasian employee, lacking the level of skill, experience and education as possessed by Johnson.

62. Despite diligent efforts, Johnson has been unable to find comparable employment.

## COUNT I

63. Johnson repeats and realleges each and every allegation set forth in paragraphs 1 through 62 above with the same force and effect as if set forth herein.

64. Defendants engaged in the conduct complained of herein, because of their discriminatory animus directed against Johnson on account of her race.

65. Defendants subjected Johnson to disparate treatment on account of her race, forced Johnson to work in a hostile environment, and retaliated against her.

66 Defendant denied Johnson the right to make and enforce contracts, as enjoyed by Caucasian persons, in violation of 42 USC sec. 1981.

67. As a proximate result of defendants' conduct, defendants have deprived Johnson of employment opportunities and has caused Johnson to sustain substantial economic and incidental damages.

68. As a proximate result of defendants' deprivation of Johnson's civil rights, Johnson has suffered and continues to suffer impairment and damage to her good name and reputation.

69. As a proximate result of defendants' deprivation of Johnson's civil rights, Johnson has suffered and continues to suffer lasting embarrassment, humiliation and other incidental and consequential damages and expenses.

70. The conduct of defendants was outrageous and malicious, was intended to injure Johnson, and was done with a conscious disregard of Johnson's civil rights, entitling Johnson to an award of punitive damages.

## COUNT II

71. Johnson repeats and realleges each and every allegation set forth in paragraphs 1 through 62 above with the same force and effect as if set forth herein.

72. Defendants subjected Johnson to disparate treatment, based on her race, forced Johnson to work in a hostile environment, and retaliated against Johnson, in violation of NYC Admin. Code sec. 8-107 et seq.

73. As a result of the foregoing discriminatory conduct of defendants, Johnson has been denied employment. Johnson has lost wages, benefits, and other employment benefits.

74. As a result of the foregoing discriminatory conduct of defendants, Johnson has suffered mental anguish, emotional distress and loss of enjoyment of life. Johnson has incurred damages thereby.

75. The conduct of the defendants was malicious and outrageous, evidencing a reckless indifference to Johnson's protected rights, in violation of the NYC Admin. Code sec. 8-107 et seq., and entitling Johnson to an award of punitive damages.

WHEREFORE, Johnson prays that this Court grant a judgment in her favor, containing the following relief:

A. A declaration that the acts and practices complained of herein are in violation of 42 USC sec. 1981 and NYC Admin. Code sec. 8-107 et seq.

B. An order directing defendants to reinstate Johnson to her former position, with salary increments, back pay and benefits, to the same extent that she would have received, but for defendants' discriminatory conduct.

C An order prohibiting defendants from continuing or maintaining a policy, practice, and/or custom of denying job opportunities to employees on the basis of their race.

D. An award to Johnson of actual damages of no less than $300,000.00, the full amount to be determined at trial for lost wages, benefits and promotional opportunities, including an award of front pay, compensating Johnson for loss of future salary and benefits.

E. An award of damages of no less than $300,000.00, the full amount to be determined at trial, to compensate Johnson for mental anguish, humiliation, embarrassment and emotional injury.

F. An award of punitive damages of no less than $500,000.00, the full amount

to be determined at trial.

      G.      An order enjoining defendants from engaging in the wrongful acts and practices complained of herein.

      H.      An award of prejudgment and postjudgment interest.

      I.      An award of reasonable attorney's fees and costs of this action.

      J.      An award of such other and further relief, as this Court may deem just and proper.

Pursuant to Fed. R. Civ. P. 38, Johnson demands a trial by jury of all issues of fact in this action.

Dated:      New York, New York
                  November 3, 2011

                                LAW OFFICE OF SANDRA D. PARKER

                                By: /s/
                                      Sandra D. Parker
                                      477 Madison Avenue, Suite 410
                                      New York, NY 10022
                                      (212) 317-2883
                                      Attorney for Plaintiff