UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
TIFFANI JOHNSON,

                Plaintiff,

        - against -

IAC/INTERACTIVE CORP. and Connected
Ventures,

                Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

11 Civ. 7909 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff Tiffani Johnson, a former employee of humor website CollegeHumor.com, brings this action alleging racial discrimination in violation of 42 U.S.C. § 1981 ("§ 1981") and the New York City Human Rights Law ("NYCHRL"). Plaintiff specifically claims that defendants engaged in racial discrimination culminating in her termination, subjected her to a hostile work environment, and undertook unlawful retaliation. Now pending before the Court is defendants' motion for summary judgment. For the reasons stated herein, this Court grants defendants' motion as it relates to the claims brought pursuant to § 1981 and dismisses without prejudice the NYCHRL claims.

## I.  Rule 56.1 Statement

Local Civil Rule 56.1 calls for a summary judgment movant to submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," and for the opposing party to submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  If the opposing party then fails to controvert a fact set forth in the movant's Rule 56.1 statement,

---

[1]  The facts recited here are drawn from the Complaint ("Compl."), filed November 4, 2011; Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, filed July 22, 2013 ("Defs. Mem."); Defendants' Rule 56.1 Statement of Material Facts in Support of their Motion for Summary Judgment, filed July 22, 2013 ("Defs. R. 56.1"); the Declaration of Shelby A. Silverman, Esq. in Support of Defendants' Motion for Summary Judgment ("Silverman Decl."), filed July 22, 2013, and the exhibits annexed thereto; the Declaration of Joshua Sussman, Esq. in Support of Defendants' Motion for Summary Judgment ("Sussman Decl."), filed July 22, 2013, and the exhibit annexed thereto; the Affidavit of Michael Schaubach in Support of Defendants' Motion for Summary Judgment ("Schaubach Aff."), filed July 22, 2013, and the exhibits annexed thereto; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed September 23, 2013 ("Pl. Opp."); Plaintiff's Response to Defendants' Rule 56.1 Statement, filed September 23, 2013 ("Pl. R. 56.1 Ctr. Stmt."); the Declaration of Tiffani Johnson in Opposition to Defendants' Motion ("Johnson Decl."), filed September 23, 2013, and the exhibits annexed thereto; the Declaration of Sandra D. Parker, Esq. ("Parker Decl."), filed September 23, 2013, and the exhibits annexed thereto; Defendants' Reply Memorandum of Law in Further Support of their Motion for Summary Judgment, filed October 25, 2013 ("Defs. Reply Mem."); the Reply Declaration of Shelby A. Silverman, Esq. in Further Support of Defendants' Motion, filed October 25, 2013 ("Silverman Reply Decl.") and the exhibits annexed thereto; and Supplemental Declarations of Tiffani Johnson ("Johnson Supp. Decl.") and Sandra D. Parker, Esq. ("Parker Supp. Decl.), filed Jan. 30, 2014, and exhibits thereto.

that fact will be deemed admitted pursuant to the local rule. Local R. 56.1(c); see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).

Plaintiff's Rule 56.1 response fails to comply with the spirit, if not the letter, of the rule. Plaintiff's counter statement contains numerous unsubstantiated denials of incontrovertible material, such as the date of plaintiff's termination and direct quotations from contemporaneous documents. See, e.g., Pl. R. 56.1 Ctr. Stmt. ¶¶ 26-35, 45-46. Plaintiff also groundlessly denies basic and irrefutable information on the defendants' corporate structure, derived from the declaration of CollegeHumor's former General Counsel. Pl. R. 56.1 Ctr. Stmt. ¶¶ 1-3. Because plaintiff's response abounds with extensive extraneous argumentation that fails to properly controvert defendants' statements, the Court is unable to fully utilize it for its intended purpose. See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."). This Court is, however, mindful that "[t]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making

factual assertions that are otherwise unsupported in the record." Giannullo, 322 F.3d at 140 (quoting Holtz, 258 F.3d at 74). Accordingly, to the extent the Court relies upon uncontroverted paragraphs of Defendant's Rule 56.1 Statement, we do so only where the record evidence duly supports defendants' contentions.

## II. Factual Allegations

Plaintiff Tiffani Johnson is an African-American graphic designer and video editor based in New York City. She holds a Bachelor of Arts degree in Broadcast Journalism from Hampton University and a Master of Science Degree in Digital Imaging and Design from New York University. Johnson Decl. ¶ 3. Prior to the events at issue in the instant suit, Johnson had developed professional experience in the graphic design and video editing field via a number of industry engagements and had also held the position of adjunct professor at New York City College of Technology, of the City University of New York, for the spring 2010 semester, during which she taught a course in digital production. Johnson Decl. ¶¶ 7-13.

Defendant Connected Ventures owns and operates CollegeHumor.com, which produces video content for distribution on its site and elsewhere. Defs. R. 56.1 ¶¶ 2, 3. Defendant IAC/Interactive Corp. is Connected Ventures' parent company. Defs. R. 56.1 ¶ 1. In recruitment literature accessed by the

plaintiff, CollegeHumor self-identified as "a leading online entertainment company targeting a core audience of people ages 18-49 . . . deliver[ing] daily comedic content, including videos, pictures, articles and jokes." Johnson Decl. Ex. C. The type of humor produced by CollegeHumor was admittedly "raunchy," (Tr. at 32) and certain video content was explicitly racial in nature, encompassing in some instances racially insensitive dialogue and even epithets. Defs. R. 56.1 ¶¶ 66-67; Johnson Decl. ¶ 67.

In or about June 2010, plaintiff Tiffani Johnson responded to an online advertisement for employment posted by the defendant, seeking a video editor for CollegeHumor.com. Johnson Decl. Ex. C; Compl. ¶ 18. Plaintiff interviewed with David Fishel, then-Director of Post-Production for CollegeHumor, and Michael Schaubach, Fishel's successor as Director of Post-Production and himself a former CollegeHumor video editor. Defs. R. 56.1 ¶¶ 4, 12; Pl. R. 56.1 Ctr. Stmt. ¶ 12. In August 2010, plaintiff was hired as a video editor, joining a Post-Production Department comprised of three or four video editors, several video directors and writers, Post-Production producer Lacy Wittman, and Director of Post-Production Schaubach, who in turn reported to Sam Reich, CollegeHumor's President of Original

Content.[2]  Defs. R. 56.1 ¶¶ 4, 11, 12, 20; Pl. R. 56.1 Ctr. Stmt. ¶ 4.

As video editor, plaintiff was assigned discrete video editing projects, for which she assumed the responsibility of creating the initial version or "cut," which included editing the story and sequence of the video. Defs. R. 56.1 ¶¶ 15-16. The first cut would then enter CollegeHumor's editorial process, in which first Schaubach and then the video's director would provide feedback known as "notes," which plaintiff would incorporate into subsequent cuts of the video and then recirculate for further review. Defs. R. 56.1 ¶¶ 7-10, 17-19. On various occasions, plaintiff personally received notes from Director of Post-Production Schaubach, her direct supervisor, in addition to Post-Production producer Wittman, directors Matt Pollock, Josh Ruben and Vincent Peone, and writers Dan Gurewitch, Sarah Schneider, Jake Horowitz, Amir Blumenfeld, and Streeter Seidell. Defs. R. 56.1 ¶ 20. After all notes were incorporated, President of Original Content Reich reviewed and approved the final video for posting on CollegeHumor's website. Defs. R. 56.1 ¶ 11.

In early January 2011, writer Sarah Schneider provided via email notes and generally positive feedback (e.g., "[l]ooking

---

[2]  Plaintiff's primary interviewer, David Fishel, was terminated by CollegeHumor in September 2010, but no evidence suggests that Fishel's termination was in any way related to Johnson's employment. Defs. R. 56.1 ¶ 13; Pl. R. 56.1 Ctr. Stmt. ¶ 13.

good") on a video project edited by Johnson. Johnson Supp. Decl. Ex. NNN. Among other comments, Schneider suggested, "the line 'with so much that can still go wrong' needs to be re-recorded (currently it's like ghetto cut)." Id. Within the hour, Schaubach, a recipient of Schneider's email, notified Reich of his "concern" with Schneider's use of the term "ghetto cut," further explaining, "Maybe nothing will come of this, I certainly don't want to blow this out of proportion, but I just wanted you to be aware that this was out there and could potentially be an issue." Parker Decl. Ex. RR. Reich replied to ask, "What does 'ghetto cut' mean?" but Schaubach testified that he never learned what Schneider had meant by that term. Id.; Schaubach Dep. at 11. In feedback for the same video project, writer David Young clarified a previous misidentification of a character, writing to a group of six, including Johnson, "Haha looks like I am racist. I meant Jordan." Defs. R. 56.1 ¶ 54; Parker Decl. Ex. SS.

In March 2011, Schaubach notified Reich via email that, in his estimation, plaintiff's "abilities as an editor are not up to the caliber that is needed for the editor position." Defs. R. 56.1 ¶ 26; Silverman Decl. Ex. 7. Citing weak editing skills and insufficient improvement over her seven months on the job, Schaubach wrote, "It saddens me to say, but my recommendation is to let Tiffani go and find a more suitable replacement." Id.

Reich solicited and received opinions on Johnson's performance from others who had reviewed her work, including directors Pollock and Ruben. Both directors agreed that Johnson "doesn't quite have the skill set that it takes to be an editor at C[ollege]H[umor]." Defs. R. 56.1 ¶ 29; Silverman Decl. Ex. 11. Pollock explained deficiencies in Johnson's speed, proficiency, and "comic sensibilities," particularly in comparison with other CollegeHumor video editors. Defs. R. 56.1 ¶ 29; Silverman Decl. Ex. 11. Ruben echoed similar complaints: "My dissatisfaction lies largely with her pace as an editor as well as her sensibilities which are lackluster . . . she exhibits strong vision but doesn't have the skill set to execute it." Defs. R. 56.1 ¶ 29; Silverman Decl. Ex. 10. Ruben's email cited specific examples of projects on which Johnson exhibited poor performance.[3] Id.

Approximately six weeks later, Schaubach assigned Johnson a series of editing projects in the "Hardly Working" series. Defs. R. 56.1 ¶ 23, Pl. R. 56.1 Ctr. Stmt. ¶ 23; Johnson Decl.

---

[3] As plaintiff emphasized in her papers, the record evidence also contains certain positive indicators regarding the quality of Johnson's performance. Pl. R. 56.1 Ctr. Stmt. ¶¶ 26-29; see Silverman Decl. Ex. 8, 9 (containing positive feedback from Schaubach to Johnson); Johnson Decl. Ex. E, H, I (same). Even Schaubach's March 2011 email to Reich recommending Johnson's termination was not uniformly negative; rather, Schaubach provided positive commentary regarding Johnson's motion graphic skills, but noted that those skills were insufficient for the video editor position. Silverman Decl. Ex. 7. Similarly, in recommending her termination, Ruben lauded plaintiff's "strong vision" but lamented her lack of the requisite "skill set to execute it," and Pollock praised her collegial demeanor ("As a person I think she's very sweet and pleasant to be around, but professionally I'm usually disappointed in the work she's done."). Schaubach Ex. 10-11.

Ex. Q.  On May 23, 2011, Post-Production producer Wittman circulated to Schaubach, Reich, and writer Dan Gurewitch a "Hardly Working" video edited by Johnson.  Defs. R. 56.1 ¶ 30; Schaubach Aff. Ex. 1.  Upon review, the team discerned serious problems with Johnson's work on the progress.  Writer Gurewitch opined that the cut was "still pretty raw" and the editing work "shows an unawareness of both technical and comedy stuff." Defs. R. 56.1 ¶ 31; Schaubach Aff. Ex. 1.  Reich judged it to be "pretty abysmal," Schaubach deemed it "a disaster," and both discussed the possibility of terminating Johnson's employment for performance reasons.  Defs. R. 56.1 ¶¶ 32-33; Schaubach Aff. Ex. 1.

Plaintiff emphasized that the review of this "Hardly Working" video was initiated by her superiors in the production department on May 24, 2011, a day on which Johnson had called in sick.  Pl. R. 56.1 Ctr. Stmt. ¶ 30.  Plaintiff further alleged that the clip was incomplete, and that the company "violated their own procedure" by not awaiting notification from Johnson herself that the cut was complete and by allowing writer Gurewitch to undertake the first review in Schaubach's place.[4] Id.

---

[4]      The email traffic indicates that Schaubach actually did ask Johnson whether the clip under review was the version she "intended to post." Johnson Decl. Ex. W.

In any event, the following week, Reich alerted Katie McGregor, Director of Human Resources for IAC and Connected Ventures, that Johnson's work product in recent weeks had been "downright awful" and that her performance had "gone from bad to worse," belying Schaubach's ability to adequately "improve her." Defs. R. 56.1 ¶¶ 34-35; Silverman Decl. Ex. 12. McGregor spoke with both Reich and Schaubach and requested that Schaubach meet with Johnson to explain deficiencies and offer a final opportunity to improve. Defs. R. 56.1 ¶ 34; Silverman Decl. Ex. 12-13. After outlining with Reich a rough agenda of items to cover, Schaubach met with Johnson on June 10, 2011. Defs. R. 56.1 ¶¶ 36-40; Silverman Decl. Ex. 14. Schaubach explained the problems with Johnson's work, offered specific suggestions for improvement, and explicitly placed Johnson on a two-week probation period, such that, if her performance failed to improve, she would be terminated. Id. Schaubach met with Johnson again during the probationary period, and, finding that she was "still struggling with getting her initial cuts up to the quality" expected, he "went over the projects she cut this week" and provided "specific examples of areas where she needs to improve," as he later relayed to McGregor and Reich. Defs. R. 56.1 ¶¶ 41-42; Silverman Decl. Ex. 14. He also provided guidance by email when Johnson's work presented "the same issues that I've seen in the past." Defs. R. 56.1 ¶ 43; Schaubach Aff.

Ex. 2.   At the end of the probationary period, Schaubach reported to McGregor and Reich that Johnson's work did not exhibit "the kind of improvement I need to see for her to retain her position here."  Defs. R. 56.1 ¶¶ 44-45; Silverman Decl. Ex. 15.   On June 24, 2011, Johnson's employment was terminated. Defs. R. 56.1 ¶ 45.

Johnson testified that, during the ten months of her employment at CollegeHumor, she experienced largely unspecified demeaning treatment from colleagues.   Defs. R. 56.1 ¶¶ 61-63. When asked to recall specific incidents, plaintiff testified that director Matt Pollock belittled her in editing sessions by saying "Everybody knows that it's this way," or "Everybody knows that you wouldn't do that," and further that in response to plaintiff's congratulations on an upcoming move, Pollock said, "I fucking hate when people say that to me."  Defs. R. 56.1 ¶ 64.   According to her testimony, Johnson complained about the condescending treatment to Schaubach, Wittman and others. Johnson Dep. at 224-226.  Plaintiff also testified that, during a discussion of software "plug-ins," director Vincent Peone said "She also got plug-ins in her hair," an apparent reference to plaintiff's braided hairstyle.  Defs. R. 56.1 ¶¶ 58-60.  More generally, plaintiff alleges that defendants failed to provide her with support or feedback equivalent to that enjoyed by other video editors, but the accuracy of that allegation is not

apparent from the record evidence, including email records and plaintiff's own testimony, which would suggest that plaintiff was given regular assistance and advice. Defs. R. 56.1 ¶ 53; Johnson Dep. at 115, 117-119.

Finally, plaintiff's testimony contains claims of retaliation—specifically, that two former colleagues, Creighton DeSimone and Matt Pollock, must have "badmouthed" her to prospective employers to prevent her from finding other employment. Defs. R. 56.1 ¶¶ 68-73; Johnson Dep. at 16, 19-27, 29, 35, 37-39, 49, 239. At this time this criticism allegedly occurred, DeSimone was no longer employed by College Humor or any IAC/Connected Ventures business. Defs. R. 56.1 ¶ 72. In deposition testimony, plaintiff was unable to identify any such negative comment, and the record contains no supportive testimony from prospective employers, DeSimone, Pollock, or otherwise. Defs. R. 56.1 ¶¶ 68-73; Johnson Dep. at 16, 19-27, 29, 35, 37-39, 49, 239.

## III. Procedural History

According to her counsel, Johnson did not administratively exhaust her charge of discrimination with the Equal Employment Opportunity Commission; hence she brings no claims pursuant to Title VII. 42 U.S.C. § 2000e et seq. Johnson filed her complaint with this Court on November 4, 2011, and defendants answered on January 6, 2012. Discovery followed, and after

briefing was completed, oral argument was held on January 23, 2014.

**DISCUSSION**

## IV. Standard of Review

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted). "In assessing the record to determine whether there is [such] a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Where that burden is

carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id. (citing Anderson, 477 U.S. at 249). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).

The Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.'" Gorzynski, 596 F.3d at 101 (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)). However, "[t]hough caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994) (citation omitted). Indeed, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). See also Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), cert. denied, 474 U.S. 829 (1985) ("Indeed, the salutary purposes of summary judgment—avoiding protracted,

expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation.").

## V.    Racial Discrimination Under § 1981

Johnson pursues her discrimination claim under 42 U.S.C. § 1981.  It is well-established that discrimination claims brought under § 1981 and Title VII are analyzed under the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491–92 (2d Cir. 2010).  First, the employee bears the burden of producing evidence to support a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  To establish a prima facie case of race discrimination under these statutes, the employee must "show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination."  Ruiz, 609 F.3d at 492.  "Although the burden of proof in establishing a prima facie case is 'minimal,' it is not non-existent."  Dumay v. City of New York, No. 09 Civ. 6866 (NRB), 2011 WL 4901311, at *7 (S.D.N.Y. Oct. 14, 2011) (quoting Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001)).

Second, if the employee establishes a prima facie case, then the evidentiary burden shifts to "the employer to

articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. In particular, the employer "'must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.'" Hongyan Lu v. Chase Inv. Servs. Corp., 412 F. App'x 413, 415 (2d Cir. 2011) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (emphasis in original)).

Third, if the employer articulates a nondiscriminatory reason for the adverse employment action, then the employee, with whom "'[t]he ultimate burden of persuading the trier of fact . . . remains at all times,'" must "demonstrate by competent evidence that 'the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination.'" Patterson v. Cnty. of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (internal quotations omitted). To create a dispute as to a material issue of fact and so defeat a motion for summary judgment, however, an employee is required to come forward with "'not simply some evidence, but sufficient evidence to support a rational finding that the legitimate nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason for the discharge." Hongyan, 412 F. App'x at 416 (quoting Van

<u>Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714 (2d Cir. 1996)).

Critically, "[i]n determining whether the articulated reason for the action is a pretext, 'a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action.'" <u>Hartley v. Rubio</u>, 785 F. Supp. 2d 165, 177 (S.D.N.Y. 2011) (quoting <u>DeMarco v. Holy Cross High Sch.</u>, 4 F.3d 166, 170–71 (2d Cir. 1993)).

Defendants argue that plaintiff has failed to show circumstances giving rise to an inference of discrimination, thereby precluding a proper <u>prima facie</u> case for discrimination. Defs. Mem. at 9-10. Given the minimal burden of establishing a <u>prima facie</u> case and our obligation to view the facts in the light most favorable to plaintiff, however, we assume for purposes of the present motion that plaintiff was terminated under circumstances giving rise to an inference of discrimination. <u>See, e.g.</u>, <u>Howard v. MTA Metro-North Commuter R.R.</u>, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) ("Despite the elaborate process set up in <u>McDonnell Douglas</u>, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a <u>prima facie</u> case and skip to the

final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action.") (citing cases); Morris v. Ales Grp. USA, Inc., No. 04 CV 8239(PAC), 2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007) ("Rather than apply the McDonnell Douglas test formalistically, the Court will assume that Morris has made out a prima facie case of discrimination on this claim."); Hamilton v. Mount Sinai Hosp., 528 F. Supp. 2d 431, 439-40 (S.D.N.Y. 2007) (listing cases in which the court assumed that plaintiff established a prima facie case of discrimination). We therefore proceed to the next steps of the McDonnell Douglas analysis and consider whether defendants have provided a legitimate, nondiscriminatory reason for terminating plaintiff, and whether said reason was non-pretextual.

The record before us easily satisfies defendants' second-step burden "of production, not persuasion." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000). To meet this burden, defendants "need not prove . . . that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory." Davis v. State Univ. of New York, 802 F.2d 638, 641 (2d Cir. 1986). The evidence—both testimonial and documentary—is consistent with defendants' proffered explanation: that plaintiff's performance fell short of CollegeHumor's desired performance standards.

At the final stage of the analysis, we examine whether plaintiff has produced evidence from which a rational jury could conclude that defendants' proffered rationale was mere pretext and that race was more likely than not a motivating factor in her termination. Here, in light of compelling evidence to the contrary, plaintiff fails to raise a triable issue of fact.

The record evidence clearly and consistently supports defendants' contention that plaintiff's poor performance—and not unlawful discrimination—prompted her termination. Most persuasively, defendants have submitted numerous contemporaneous documents from multiple sources, including Johnson's supervisor and others who directly reviewed her work, attesting to problems with Johnson's editing skills, work product, pace of work, and comedic sensibilities. See, e.g., Silverman Decl. Ex. 7, 10, 11; Schaubach Aff. Ex. 1, 2. The testimonial evidence from Johnson's colleagues and supervisors, to the extent relevant, echoes the same performance issues reflected in the documents. See, e.g., Schaubach Tr. 157–161.

Plaintiff unpersuasively attempts to rebut this record by arguing that defendants inaccurately evaluated Johnson's abilities, and that the extensive documentation of Johnson's deficiencies constitutes mere "conclusory statements," insufficient to meet defendants' burden. Pl. Opp. at 18; see also Pl. R. 56.1 Ctr. Stmt. ¶¶ 28, 29, 35, 42 (feedback was

"conclusory and inaccurate;" "Reich so described what he incorrectly believed to be Johnson's capabilities"). To be sure, to prevail on summary judgment an employer must provide "clear and specific" non-discriminatory reasons; mere "vague or conclusory averments of good faith" will not suffice. <u>Meiri v. Dacon</u>, 759 F. 2d. 989, 997 (2d Cir. 1985). However, since the emails reference specific skill deficits and individual video projects on which Johnson's work was inadequate, defendants have surely fulfilled this requirement. Silverman Decl. Ex. 7, 10, 11; Schaubach Aff. Ex. 1, 2. To claim, as plaintiff does, that defendants have relied on "conclusory statements" is to misunderstand the meaning of "conclusory."

Moreover, plaintiff's argument misunderstands the nature of the law's requirements and the Court's inquiry here. In a discrimination case, the Court is "decidedly not interested in the truth of the allegations against plaintiff," but rather only asks "what <u>motivated</u> the employer." <u>McPherson v. N.Y. City Dep't of Educ.</u>, 457 F.3d 211, 216 (2d Cir. 2006) (internal quotation marks omitted). Hence,

> [a] series of serious, independent, documented and therefore good faith complaints by an employer undermines an employee's argument that the employer's decision to terminate him was a pretext for discrimination. And if the employer relied upon these complaints in good faith, there is no violation of the employee's rights,

> even if the complaints turn out to be wrong
> or inaccurate.

_Finn v. N.Y. State Office of Mental Health-Rockland Psychiatric Ctr._, No. 8 Civ. 5142 (VB), 2011 WL 4639827, at *14 (S.D.N.Y. Oct. 6, 2011) (internal citations and quotations omitted). Here, the record contains just this type of serious, independent, documented, good faith complaints, the substance of which were conveyed to plaintiff at the start of her probationary period and prior to her termination. The law does not require an independent assessment of the accuracy of this criticism of plaintiff's performance. To undertake such an appraisal would improperly convert the federal court into "a court of personnel appeals." _Alfano v. Costello_, 294 F.3d 365, 377 (2d Cir. 2002); _see also_ _Byrnie v. Bd. Of Educ._, 243 F.3d 93, 103 (2d Cir. 2001) ("[The court's] role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments.") (quoting _Simms v. Okla. ex. rel. Dep't of Mental Health & Substance Abuse Servs._, 165 F.3d 1321, 1330 (10th Cir. 1999) (internal quotation marks omitted).[5]

---

[5]    For the same reasons, with regard to plaintiff's allegations that video editor Nick Barbieri exhibited equivalent performance problems (<u>see, e.g.</u>, Pl. Opp. at 2, 18), we merely note that the record presented here does not reflect the kind of "serious, independent, documented and therefore good faith complaints" about Barbieri's work as were made about Johnson's work, or indeed any internal discussion of performance issues with Barbieri at all. <u>Finn</u>, 2011 WL 4639827, at *14.

Instead, this Court has focused its scrutiny on the limited evidence plaintiff has presented of race-based conduct and found it wanting. Plaintiff's case hinges primarily on the probative force of three comments that might be considered racially-tinged: writer Schneider's "ghetto cut" email; writer Young's misidentification email ("Haha looks like I am racist. I meant Jordan."); and director Peone's comment regarding "plug-ins" in plaintiff's hair. Even assuming <u>arguendo</u> that these comments were in fact racially-charged—a position that is by no means evident or conclusive—plaintiff's argument fails because "allegedly discriminatory comments made by a nondecisionmaker are, as a matter of law, insufficient to raise an inference of discrimination." <u>De la Cruz v. City of New York</u>, 783 F.Supp.2d 622, 643 (S.D.N.Y. 2011) (collecting cases). Plaintiff acknowledged at oral argument that she has adduced no evidence of any racially-tinged remark spoken or emailed by any of plaintiff's supervisors or any individuals responsible for her dismissal. Tr. at 17-19. Though plaintiff attempted to argue that all members of the CollegeHumor team contributed to the decision to terminate her employment, in fact the record indicates otherwise. Tr. at 19. The uncontroverted fact is that three individuals senior to plaintiff—her direct supervisor Schaubach, President of Original Content Reich, and Director of Human Resources McGregor—made the decision to terminate her

employment. Neither Schneider, nor Young, nor Peone—the authors or utterers of the three questionable comments—were even among those solicited for opinions on plaintiff's performance, much less decision-makers regarding her continued employment. These comments do not constitute persuasive evidence that discriminatory animus was the motivation for plaintiff's termination.

Plaintiff has failed to present "sufficient evidence to support a rational finding that the legitimate nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason for the discharge," and thus does not raise a genuine issue of material fact as to her § 1981 claim. Hongyan, 412 F. App'x at 416 (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)). That claim is accordingly dismissed.

## VI. Hostile Work Environment

"In order to survive summary judgment on a claim of hostile work environment harassment, a[n employee] must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000), superseded by statute on other grounds, Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85 (internal

quotation marks omitted) (analyzing claims brought <u>inter alia</u> under Title VII and § 1981). A hostile work environment claim requires a showing that: (1) the plaintiff was subjected to harassment, based on her protected class, that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"; and (2) "that a specific basis exists for imputing the objectionable conduct to the employer." <u>Alfano v. Costello</u>, 294 F.3d 365, 373 (2d Cir. 2002) (internal citation omitted).

This test contains both objective and subjective elements; plaintiff must show that the defendants' conduct (1) was "objectively severe or pervasive—that is, . . . create[d] an environment that a reasonable person would find hostile or abusive"; (2) created an environment that plaintiff "subjectively perceive[d] as hostile or abusive"; and (3) occurred because of plaintiff's protected characteristic. <u>Patane v. Clark</u>, 508 F.3d 106, 113 (2d Cir. 2007). Furthermore, objective severity is assessed based on a "totality of the circumstances," which may include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." <u>Id.</u> at 113 (internal citations omitted).

"For racist comments, slurs, and jokes to constitute a hostile work environment . . . there must be more than a few isolated incidents of racial enmity." Aulicino v. New York City Dept. of Homeless Services, 580 F.3d 73, 83 (2d Cir. 2009) (quoting Schwapp v. Town of Avon, 118 F.3d 106, 110-11 (2d Cir. 1997) (internal quotations omitted). However, although isolated incidents typically will not establish a hostile work environment, a single episode of harassment, if severe enough, can suffice. Patterson v. County of Oneida, N.Y., 375 F.3d 206, 227 (2d Cir. 2004).

Because "[e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude," courts have found it important in hostile work environment cases "to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination." Alfano, 294 F.3d at 377. "It is axiomatic that mistreatment at work, [including] subjection to a hostile work environment or through such concrete deprivations as being fired . . . is actionable [under § 1981] only when it occurs because of an employee's . . . protected characteristic." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Thus, even if plaintiff's work environment was objectively and subjectively hostile, she will not have a claim "unless she can also demonstrate that the hostile work

environment was caused by animus towards her as a result of her membership in a protected class." Sullivan v. Newburgh Enlarged School Dist., 281 F.Supp.2d 689, 704 (S.D.N.Y. 2003) (citation omitted). In other words, "[a]n environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes." Forts v. City of New York Dept. of Correction, No. 00 Civ. 1716 (LTS), 2003 WL 21279439, at *4 (S.D.N.Y. June 4, 2003) (citing Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff argues that her hostile work environment claim is not "limited to separate and distinct acts of the defendants," but rather encompasses miscellaneous incidents. Pl. R. 56.1 Ctr. Stmt. ¶¶ 52-67. Of those, the three racially-tinged comments discussed supra constitute the most arguably race-based conduct. Plaintiff also contends that other conduct contributed to the hostile work environment, such as rude but racially-neutral comments delivered to Johnson in a demeaning tone, the hiring of a Caucasian woman as a video editor in the months after Johnson's departure, an undesirable apportionment of assignments, inadequate support, premature review of her work, the strict standard of review applied to her work, and the storylines and general nature of the humor videos, some of it race-based, that defendants' business produces. Id.

Assuming for the purposes of this motion the truth of plaintiff's contentions, these allegations fail to raise a triable claim of hostile work environment under § 1981. Even accepting _arguendo_ that the three racially-tinged comments were in fact racist, they do not constitute the type of "severe or pervasive" treatment that would "alter the conditions of her employment and create an abusive working environment." _Alfano_, 294 F.3d at 373. At worst, they only amount to a "few isolated incidents of racial enmity," which is insufficient to establish a hostile work environment claim. _Aulicino_, 580 F.3d at 83.

As for the rest of the conduct, even if true, the allegations entirely fail to exhibit the requisite "linkage or correlation to the claimed ground of discrimination," i.e., plaintiff's race. _Alfano_, 294 F.3d at 377. Plaintiff's allegations cannot support her claim without "some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." _Id._ at 378. Some of the conduct (notably Pollock's profane reply to Johnson's pleasantry)[6] is certainly rude, but the case law instructs that boorish behavior, without more, does not create an actionable hostile work environment. Plaintiff's argument further deteriorates when we consider that the record evidence

---

[6]     As discussed _supra_, plaintiff testified that, in response to her proffered congratulations on an upcoming move, director Matt Pollock said, "I fucking hate it when people say that to me." Defs. R. 56.1 ¶ 64.

at minimum calls into question the accuracy of many of the facts alleged, including contentions of insufficient support or unfair division of assignments.

Evaluating, as we must, the "totality of the circumstances," we find that plaintiff fails to raise a genuine issue of triable fact with respect to her hostile work environment claim, which is hereby dismissed. Id.

**VII. Retaliation**

Plaintiff's retaliation claim is subject to the same three-step burden-shifting framework that also governs discrimination claims under § 1981. See Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010). Here, plaintiff has failed to adduce any evidence of retaliation beyond sheer speculation. Plaintiff's claim that defendants criticized her to prospective employers following her termination in retaliation for bringing this suit finds no factual support whatsoever in the record. Beyond noting that CollegeHumor director Matt Pollock was friends with another prospective employer in the industry, plaintiff offered no substance, circumstances, or any particulars about what, if anything, might have been said. Defs. R. 56.1 ¶¶ 68-73; Johnson Dep. at 16, 19-27, 29, 35, 37-39, 49, 239. Indeed, in her deposition testimony, Johnson herself appeared uncertain that any such negative comments were made. Id. At oral argument,

plaintiff conceded that she had presented no testimony from prospective employers stating that they had contacted any of plaintiff's references, and further admitted with regard to the retaliation claim that "to a certain extent it is speculation." Tr. at 20-21. We are well beyond the stage at which mere speculation can sustain plaintiff's claim. In the absence of supporting evidence, Johnson's retaliation claim fails on its face.

## VIII.    NYCHRL Claim

Discrimination claims brought under the NYCHRL are evaluated under a more permissive standard than analogous federal claims. To establish a NYCHRL claim, a plaintiff must only demonstrate "by a preponderance of the evidence that she has been treated less well than other employees because of her [race]." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013) (citation omitted). The Second Circuit has described the proper analysis under the NYCHRL as follows:

> While it is unclear whether McDonnell Douglas continues to apply to NYCHRL claims and, if so, to what extent it applies, the question is also less important because the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a

29

> matter of law that 'discrimination play[ed] no role'
> in its actions.

Id. at 110 n.8 (quoting Williams v. N.Y. City Hous. Auth., 61 A.D.3d 62, 78 n.27 (1st Dep't 2009)).

We need not engage in this inquiry. Having granted summary judgment and dismissed all of the claims for which there exists federal-question jurisdiction, it is within the Court's discretion to exercise supplemental jurisdiction over plaintiff's remaining municipal law claims. Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y., 464 F.3d 255, 262-63 (2d Cir. 2006); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988) ("in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims"). We exercise this discretion here and decline supplemental jurisdiction over Johnson's NYCHRL claim, which is hereby dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted insofar as this Court dismisses all federal claims. This Memorandum and Order resolves Docket No. 19. The Clerk of Court is respectfully requested to close this case.

Dated:     New York, New York
           February 24, 2014

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorney for Plaintiff**

Sandra D. Parker, Esq.
Law Office of Sandra D. Parker
444 Madison Avenue, Suite 502
New York, NY 10022

**Attorneys for Defendants**

Michele A. Coyne, Esq.
Shelby A. Silverman, Esq.
Kauff McGuire & Margolis LLP
950 Third Avenue, 14th Floor
New York, NY 10022